## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**GEORGIAETTA F. WILKINS,**
        **Plaintiff,**

**v.**                                              **Case No. 3:11cv356/LC/CJK**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
        **Defendant.**

_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v.  The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's applications for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34, and for supplemental security income under Title XVI, 42 U.S.C. §§ 1381-83.

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence.  The decision of the Commissioner, therefore, should be affirmed.

## PROCEDURAL HISTORY

On July 1, 2009, Georgiaetta F. Wilkins (who will be referred to by name, as plaintiff, or as claimant) filed an application for disability insurance benefits.[1]  T. 23. Claimant also filed an application for supplemental security income on June 11, 2009. T. 23. In both applications claimant alleged disability beginning July 19, 2006. T. 23. The applications were denied initially and upon reconsideration. T. 114-22, 125-30. Claimant filed a written request for a hearing, which was held before an administrative law judge ("ALJ") on January 10, 2011. T. 40-69. In a decision dated January 26, 2011, the ALJ denied claimant's applications for disability insurance benefits and supplemental security income, finding that jobs exist in significant numbers in the national economy that claimant can perform , and thus that she had not been under a disability within the meaning of the Social Security Act at any time from the alleged onset date to the date of decision.  T. 23-34. The Appeals Council for the Social Security Administration denied plaintiff's request for review on June 7, 2011, rendering the ALJ's decision the final decision of the Commissioner. T. 1. In the present action for review of the Commissioner's decision, Ms. Wilkins raises two issues, asserting that the Commissioner erred in 1) rejecting the opinion of her treating physician and rendering a residual functional capacity assessment which is not supported by the medical opinion of any treating or examining medical source, and 2) failing to pose a comprehensive hypothetical question to the vocational expert. (Doc. 17, pp. 4, 17).

Claimant had filed an earlier Title II application on July 18, 2006, which was

---

[1] The administrative record, as filed by the Commissioner, consists of 8 volumes (docs. 15-2 through 15-9), and has 441 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

subsequently considered by an ALJ; claimant was found not disabled within the meaning of the Social Security Act. T. 76-91. The Appeals Council of the Social Security Administration denied plaintiff's request for review on September 3, 2010, rendering the ALJ's decision the final decision of the Commissioner. T. 104-08. In her current application, claimant alleged disability beginning on July 19, 2006, an implied request to reopen the prior application. T. 23. At the hearing, claimant by and through her attorney, amended her alleged onset date of disability to April 15, 2009. Therefore, the ALJ did not consider claimant's allegations of disability prior to that date, and any reference to such information before that date is only to establish the history of claimant's allegations.  T. 23.

## FINDINGS OF THE ALJ

In his written decision the ALJ made a number of findings relative to the issues raised in this appeal:

1. Claimant met the insured status requirements of the Social Security Act through December 31, 2011.

2. Clamant has not engaged in substantial gainful activity since April 15, 2009, the amended alleged onset date.

3. Claimant has the following severe impairments: degenerative disc disease of the lumbar spine, cervicalgia, and depression.

4. Clamant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Claimant had the residual functional capacity to perform less than the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b).

Specifically, she would need to change positions from sitting to standing but would not need to leave the workstation. She can no more than occasionally operate foot controls. She cannot work around unprotected heights or dangerous equipment. She cannot climb ladders, scaffolds, or ropes. She can no more than occasionally bend, stoop, crouch, kneel, crawl, or climb stairs or ramps. She is restricted from complex or detailed job instructions.

6. Claimant is unable to perform any past relevant work.

7. Claimant was born on September 27, 1965, and was 43 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date.

8. Claimant has at least a high school education and is able to communicate in English.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. Claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2009, through the date of decision.

<u>STANDARD OF REVIEW</u>

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ.  *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal

standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). With reference to other standards of review, the Eleventh Circuit has said, "'Substantial evidence is more than a scintilla . . . .'" *Somogy v. Comm'r of Soc. Sec.*, 366 F. App'x 56, 62 (11th Cir. 2010) (*quoting Lewis*, 125 F.3d at1439). Although the ALJ's decision need not be supported by a preponderance of the evidence, "it cannot stand with a 'mere scintilla' of support." *See Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. *See Sewell v. Bowen*, 792 F.2d 1065, 1067 (11th Cir. 1986). The reviewing court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner] . . . .'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). Nevertheless, a reviewing court may not look "only to those parts of the record which support the ALJ[,]" but instead "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." *See Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). In sum, review is deferential to a point, but the reviewing court conducts what has been referred to as "an independent review of the record."[2] *See Flynn v. Heckler*, 768 F.2d 1273, 1273 (11th Cir. 1985); *see also Getty ex rel. Shea v. Astrue*, No.

---

[2] The Eleventh Circuit speaks not only of independent review of the administrative record, but reminds us it conducts *de novo* review of the district court's decision on whether substantial evidence supports the ALJ's decision. *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

2:10–cv–725–FtM–29SPC, 2011 WL 4836220 (M.D. Fla. Oct. 12, 2011); *Salisbury v. Astrue*, No. 8:09-cv-2334-T-17TGW, 2011 WL 861785 (M.D. Fla. Feb. 28, 2011). The recitation of medical and historical facts of this case, as set out below, is based upon my independent review.

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.  Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  *See* 20 C.F.R. § 404.1512.  The Eleventh Circuit has explained the operation of step five:

> In practice, the burden temporarily shifts at step five to the Commissioner.  *See Jones*, 190 F.3d at 1228.  The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  *See id.*  In order to be considered disabled, the claimant must then prove that [she] is unable to perform the jobs that the Commissioner lists.  *See id.*  The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.  *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987) ("The shifting of the burden of proof is not statutory, but is a long-standing judicial gloss on the Social Security Act")).

*Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

Step five (or step four in cases where the ALJ decides a claimant can perform her past work) is often where the rubber meets the road.  At that point, the ALJ formulates the all-important residual functional capacity.  Even where one or more severe impairments are established, the claimant must show that she cannot perform work within that residual functional capacity.  The ALJ establishes residual functional capacity, utilizing the impairments identified at step two, by interpretation of (1) the medical evidence, and (2) the claimant's subjective complaints (generally complaints of pain).  Residual functional capacity is then used by the ALJ to make

the ultimate vocational determination required at step five.[3]  "[R]esidual functional capacity is the most [claimant] can still do despite [her] limitations."[4]  20 C.F.R. § 404.1545(1).  Often both the medical evidence and the accuracy of a claimant's subjective complaints are subject to a degree of conflict, and that conflict leads, as in this case, to the points raised on judicial review by many disappointed claimants.

## FACT BACKGROUND AND MEDICAL HISTORY

Plaintiff was born on September 27, 1965, making her forty-three years old on the alleged disability onset date.  T. 32.  Claimant has at least a high school education and is able to communicate in English.  T. 32.  Alleging disability beginning April 15, 2009, plaintiff cites "neck, back pain, bulging disc, degenerative disc disease, lumbar myofascial pains and spasms, cervical myofascial pain, reflux, [and] high blood

---

[3] "Before we go from step three to step four, we assess your residual functional capacity. (See paragraph (e) of this section.) We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."  20 C.F.R. § 404.1520(a)(4).

[4] In addition to this rather terse definition of residual functional capacity, the Regulations describe how the Commissioner makes the assessment:

> (3) Evidence we use to assess your residual functional capacity.  We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.  (See § 404.1512(c).)  However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.  (See §§ 404.1512(d) through (f).) We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.)  We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.  (See paragraph (e) of this section and § 404.1529.)[.]

20 C.F.R. § 404.1545(a)(3).

pressure," as conditions that limit her ability to work.  T. 45, 209.  She reported past work experience in a custodial/warehouse position and cosmetology.  T. 210.

Claimant suffers from physical injuries to her neck and low back, stemming from a car accident in 2005.  T. 310.  After undergoing a cervical spine MRI in May 2006, a lumbar spine MRI on October 3, 2006, revealed disc protrusion progressed paracentral to the left at L5-S1 with probable exiting L5 root effect, and limited spondylosis and disc protrusion at L4-5 with no observable root effects.  T. 303.

Claimant visited Dr. Ruben Timmons, a pain management physician, on April 23, 2007, and he saw plaintiff at least three times over the next six months.  T. 306-09.  Claimant presented complaining of back and right lower extremity pain.  T. 309. Dr. Timmons recorded mild depression and anxiety, but plaintiff also exhibited appropriate affect and mood during the examination.  T. 309.  Claimant had "marked spasms" along the cervical paravertebral musculature, and Dr. Timmons administered four trigger point injections at C3, C4, and C5.  T. 309.  He assessed lumbar degenerative disc disease, lumbar disc bulge at L4-L5 and L5-S1, and cervicalgia. T. 309.  He recommended an L5 disc decompressor procedure and noted that plaintiff had "great relief" from L4 pain symptomatology.  T. 309.  He stated that claimant's function was "limited," though she could continue working at sedentary duty.  T. 309.

On October 15, 2007, plaintiff returned to Dr. Timmons, complaining of neck and back pain with tightness in both shoulders.  T. 308.  Dr. Timmons noted tenderness over the lumbar paravertebral musculature and administered three trigger-point injections at L3, L4, and L5.  T. 308.  Dr. Timmons repeated this procedure at a re-evaluation two weeks later, where he noted that plaintiff had undergone a discogram for her pain.  T. 306.  He assessed plaintiff's permanent impairment for

two-level disc disease (L4-L5 and L5-S1) at eleven percent.  T. 306.  Dr. Timmons'
concluded that plaintiff would be limited to sedentary duty, and restricted her from
bending, standing, crawling, or lifting.  T. 306.  He then stated, however, "No lifting
more than five pounds on an occasional basis."  T. 306.  Dr. Timmons concluded that
"[t]he frequency and intensity of her pain which may be anticipated [from] her
permanent condition would be constant [with] some days worse than others."  T. 307.

       To further manage her pain claimant began seeing Dr. Stewart Zweikoft in
2007, and she continued to see him until at least the end of 2010.  T. 381-404, 435-
41.  On January 8, 2008, plaintiff had continued complaints of neck and back pain,
with spasms.  T. 403.  Dr. Zweikoft noted, however, that claimant's low back was
"significantly improved," with only a primary complaint of occasional tingling and
numbness.  T. 403.  Dr. Zweikoft listed "depression" and "anxiety" under his
"Review of Systems," though plaintiff's affect and mood were appropriate.  T. 400.
Claimant was status post compression, and though the decompression procedure had
produced some positive effect at L4-5, claimant stated that it could not be repeated
at L5-S1 because of insurance issues.[5]  T. 403.  Plaintiff received injections for trigger
points in the cervical, trapezius, and scapular musculature.  T. 403.  Dr. Zweikoft
assessed cervicalgia, myofascial pain syndrome, lumbar HNP, and lumbar
degenerative disc disease.[6]  T. 403.  He prescribed Topamax.  T. 404.

       Three months later plaintiff returned to Dr. Zweikoft for another round of

---

       [5] It is unclear on which disc level the decompression was performed. Claimant later stated
that it was performed at L5-S1, and that she declined to have a second procedure at L4-5. T. 311.
Dr. Timmons initially recommended the procedure at the L5 level.  T. 309.

       [6] Lumbar "HNP" is short for "herniation of nucleus pulposus."  DORLAND'S POCKET
MEDICAL DICTIONARY 320 (W.B. Saunders Co., 22nd ed. 1977)

injections, this time for trigger points palpable at L4 bilaterally, and in both trapezius muscles. T. 400. He recommended Ultram because the Topamax was too expensive. T. 400. Plaintiff next visited Dr. Zweikoft on October 28, 2008. T. 398. Ms. Wilkins exhibited 5/5 strength bilaterally, but stated that she had been "dropping things" and made subjective complaints of radiculopathy in the upper extremities. T. 398. Dr. Zweikoft administered injections in plaintiff's shoulders and lower back, and planned for a cervical spine MRI. T. 397-98. The MRI was not performed, however, because plaintiff's insurance denied coverage, claiming that she had not "failed with a course of conservative therapy," and mandated cervical spine physical therapy. T. 388, 393. Dr. Zweikoft disagreed, stating that "[plaintiff] has actually had a multitude of interventions . . . [which] has not been communicated to them." T. 394. In February 2009, however, Dr. Zweikoft prescribed physical therapy and Relafen. T. 393.

An x-ray taken on November 17, 2008, showed no significant plain-film abnormality of the lumbar spine. T. 322. Two weeks later, claimant presented to Dr. Richard Lucey for a consultative physical exam. T. 310. Ms. Wilkins complained that her injuries were "aggravated with bending and lifting." T. 311. Plaintiff stated that Dr. Timmons had referred her to two chiropractors, who treated her with physical therapy, massages, and electric stimulation. T. 310. Plaintiff claimed limited relief from the chiropractic treatment and trigger point blocks, and "partial relief" from lumbar disc decompression. T. 311. Plaintiff declined to have an additional decompression procedure because "she did not feel that she got sufficient relief . . . to justify further treatment." T. 311. Dr. Lucey characterized the results of plaintiff's May 2006 MRI as "minimal spondylosis of the cervical spine with no cord or root findings observed, and small osteophytes anterolaterally from the canal at C4-5 and

C5-6 and minimally at C6-7."  T. 310.

Concerning plaintiff's neck, Dr. Lucey noted no spasms or tenderness on direct palpation, and a full range of movement.  T. 311.  Plaintiff had no deficiencies in her upper and lower extremities.  T. 312.  In evaluating claimant's back Dr. Lucey noted normal gait, no spasms or tenderness on direct palpation, mildly diminished range of movement in the thoracolumbar spine, and no evidence of discomfort in transferring easily from a sitting to a supine position.  T. 312.  Dr. Lucey assessed lumbar spondylosis, lumbar disc disease with evidence of herniation, cervicalgia, minimal spondylosis of the cervical spine, and possible mild degenerative arthritis in the right knee.  T. 312.  Dr. Lucey stated that claimant could occasionally lift up to ten or twenty pounds, and sit for seven hours, stand for four hours, and walk for one hour total in an eight-hour work day.  Plaintiff could also occasionally reach overhead, and push or pull objects with her hands.  T. 318.  Plaintiff could never crawl or climb ladders or scaffolds, but she could occasionally climb stairs, stoop, and kneel.  T. 319.

During this time Dr. Zweikoft continued to administer trigger point injections. T. 388-90.  On April 23, 2009, plaintiff's complaints of neck and low back pain were "essentially unchanged," and Dr. Zweikoft planned to have claimant scheduled for physical therapy.  T. 389.  Dr. Zweikoft also expressed concern that plaintiff's disability application had been denied, noting that the decision seemed to have been primarily based on Dr. Lucey's consultative report.  T. 389.  Dr. Lucey's report did not mention the evaluations of Dr. Zweikoft or Dr. Timmons, and Dr. Zweikoft was "in agreement with Dr. Timmons' assessment of this patient as she continues to have some significant pain which I consider to be debilitating with underlying 2 level disc disease in the lumbar spine."  T. 389.

By May 29, 2009, plaintiff's referral for physical therapy had still not "gone through," and Dr. Zweikoft administered five injections for trigger points palpable in the lumbar spine and trapezius muscles.  T. 384.  Plaintiff was able to have another MRI in June 2009, revealing facet osteoarthritis at L4-5 and L5-S1.  T. 382.  At L5-S1 the MRI showed  minimal degenerative disc changes and an annular bulge and fissure.  T. 382.

On June 30, 2009, Dr. Zweikoft completed a Physical Capacities Evaluation form.  T. 324.  He indicated that plaintiff could sit for four hours and stand for four hours in an eight-hour workday, frequently lift five pounds, and occasionally lift ten pounds.  T. 324.  Dr. Zweikoft restricted plaintiff from bending, squatting, crawling, climbing, reaching, and pushing or pulling.  T. 324.  At an August 2009 appointment, Dr. Zweikoft recorded that plaintiff has "good days and bad days," with "worsening pain symptoms which have failed to improve following treatment."  T. 382.  Plaintiff was tender over the bilateral C5, middle trapezius musculature, and lumbar paraspinal musculature, but Dr. Zweikoft concluded that "[plaintiff] is essentially stable.  She [has] intermittent pain complaints and we performed trigger point injections . . . which will hopefully get her pain under control and give her better function."  T. 382.  Claimant was told to return in six months.  T. 382.

Throughout her medical history plaintiff visited a primary physician, Dr. Janice Buckley, for general health problems.  T. 52, 331-44, 425-34.  On September 10, 2009, Dr. Buckley noted that claimant felt she was "under a great deal of stress with a new husband and having to raise teenagers."  T. 331.  Plaintiff then visited Dr. Susan Danahy for a psychological evaluation on October 27, 2009.  T. 350.  Claimant stated that she briefly took Cymbalta for depression when her son was ill, and she

now felt depressed again because of her medical issues.  T. 351.  She claimed to suffer from memory problems, though she was able to give an overview of her medical history with most dates.  T. 351.

Dr. Danahy described plaintiff's affect as "anxious" and "depressed," and claimant cried while discussing her marriage.  T. 352.  She noted, however, that "nothing . . . suggest[ed] significant neuropsychological deficits," and claimant's mental status was "not indicative of anything that would interfere with the kind of jobs [she] has held in the past."  T. 351-52.  Plaintiff seemed to have "low average" intelligence, but her insight and judgment were intact, with a "reasonably good" ability to form rapport.  T. 352.  Dr. Danahy characterized claimant's mental status as "reasonably intact," citing (among other things) her ability to subtract serial threes from twenty, and remember three out of three objects after five minutes.  T. 352.  Plaintiff estimated her disability to be seventy-five percent physical, but also (incongruously) fifty percent psychiatric, claiming that her mental problems prevent her from "getting the job done in a timely manner."  T. 353.  Dr. Danahy's impression was "depressive disorder NOS," with a Global Assessment Functioning ("GAF") score of 55.  T. 353.  She concluded that claimant's disability primarily resulted from orthopedic pain, and that plaintiff could benefit from medication or therapy.  T. 353-54.  Dr. Danahy noted that intellectual testing would be important if "there [was] a question of whether [plaintiff could] do anything else other than [her past] physical work."  T. 354.

On November 23, 2009, State agency psychologist Dr. Judith Meyers completed a Psychiatric Review Technique.  T. 355.  Dr. Meyers assessed depressive disorder NOS, with a "moderate decrease" in mental functioning and moderate

limitations in maintaining concentration, persistence, or pace.  T. 365, 367.  Dr. Meyers believed that claimant's statements, along with Dr. Danahy's report on file, were partially credible when weighed against the overall objective evidence, noting plaintiff's functional limits to be "largely physical in nature."  T. 367.  Dr. Meyers also provided a Mental Residual Functional Capacity ("MRFC") Assessment, in which she determined plaintiff to be moderately limited in the ability to understand, remember, and carry out detailed instructions.  T. 369.  Ms. Wilkins was also moderately limited in her ability to maintain attention and concentration for extended periods.  T. 369.  Dr. Meyers concluded that plaintiff retained the ability to perform simple, repetitive tasks, and likely retained the ability to perform tasks at higher levels.  T. 371.  Overall, Dr. Meyers assessed that claimant could meet the basic mental demands of sustained work, despite any identified limitations from a medically determinable impairment.  T. 371.

One week later, claimant underwent a Physical Residual Functional Capacity ("RFC") Assessment. T. 373.  State agency physician Dr. Clarence Louis determined that plaintiff could stand and/or walk for six hours, and sit for six hours in an eight-hour workday.  T. 374.  Plaintiff could also frequently lift ten pounds.  T. 374.  Dr. Louis cited to several portions of plaintiff's medical record in determining the RFC, including the MRI, discogram, and examination notes from Drs. Buckley and Zweikoft.  T. 374-75.  Dr. Louis found that plaintiff's symptoms were attributable to a medically determinable impairment, but concluded that the severity of the symptoms was inconsistent with the total medical and nonmedical evidence.  T. 378.  Dr. Louis noted that claimant could walk without assistance, drive, and perform some light chores, thus granting only partial credibility to her alleged functional limitations.

T. 378.   Dr. Zweikoft's Physical Capacities Evaluation was given little weight because the overall evidence did not support his opinion, and upon re-contacting him no additional substantiating reports were provided.  T. 379.

Plaintiff returned to Dr. Zweikoft on February 24, 2010, when he stated that plaintiff has done "fairly well with conservative care, though she presents today with some increased pain." T. 381.  Dr. Zweikoft administered injections once every three months until November 24, 2010, and in August noted that plaintiff "responds quite well to trigger point injections and has been stable on this regimen."  T. 435-41.

## HEARING BEFORE THE ALJ

The administrative hearing commenced on January 10, 2011, with plaintiff's attorney amending the alleged onset date to April 15, 2009. T. 45. Counsel explained that, while Ms. Wilkins had acquired no new impairments since her first denial of benefits by an ALJ on April 14, 2009, her then-existing impairments had worsened, citing low back pain, hypertension, and depression.

Plaintiff then began her testimony by describing the injuries that allegedly prevent her from working.  T. 47.  Claimant asserted that she is basically sedentary, citing "like 5 discs that are bulging," in addition to arthritis, increased numbness, feeling cold, and becoming easily irritated. T. 52-53.  Claimant's physical problems are the result of a car accident, when another driver "sideswiped" her and caused her car to spin.  T. 55.  Plaintiff described her pain as a "constant tightening in . . . the neck and shoulders . . . like [she is] never relaxed." T. 54.  She also expressed that she suffers from "a lot of" neck spasms. T. 54. Claimant characterized her lower back as "aching," and stated that she hears a clicking in her hips when she walks. T. 54.

To manage her pain plaintiff takes Flexeril and Tramadol twice a day, which

she admits "helps," and receives massages from her husband or son, takes baths in Epsom salt, and uses rubbing alcohol to relieve tension.  T. 53-54.  Plaintiff stated that she can walk for thirty minutes to one hour, which is the time it takes to get "in and out" of a store to pick up  prescriptions or small items.  T. 54-55.  She testified that she can sit or stand for twenty to thirty minutes each.  T. 55.  She becomes "more rigid" after sitting for a while, and always sits on a cushion.  T. 55.  Claimant testified that the first disc decompression surgery "scared [her] so bad," which is why she declined to have a second.  T. 53. She stated that she wanted to wait to take the next step, a spinal fusion, until she "didn't think [she] could walk anymore," because that involved putting a steel rod in her back. T. 53.

Claimant then described her past employment, stating that she had been an "actual picker," loader, and processor for at least seven years in a liquor distribution warehouse. T. 48. Claimant's basic responsibility was to "process un-sellable goods," which involved writing off damaged goods (like broken bottles), and crediting customers.  T. 50.  This required claimant to "pick bottles or cases out of the warehouse[s]."  T. 50.  Plaintiff stated that she usually used a hand picker to accomplish the pickup, but if "things were large" she would ride a picker. T. 50.

 After her car accident claimant's warehouse duties were too "strenuous," and the company moved her to the position of "office helper," which involved answering phones, taking notes, and some "financial stuff . . . adding and subtracting." T. 48-49. Claimant admitted that she could not fulfill the needs of the job, particularly the financial duties, and was "written up" at least twice in her less-than-six months of holding the position. T. 49, 51. She stated that the company tried to help her keep the job by providing her with "a lot of orthopedic stuff," including a new chair for her

lumbar problem, and an earpiece for the telephone in lieu of having to pick it up. T. 55. Plaintiff testified, "[I] physically wasn't able to keep up . . . I've exhausted all that I could have done on that job."  T. 55.  After the second write-up Human Resources representatives asked Ms. Wilkins to return to the warehouse to handle boxes. T. 51. Plaintiff declined the offer, stating that it "wouldn't have [been] an eight-hour job," only four or five hours instead.  T. 51.  She also found the conditions unsatisfactory because the job required working the night shift, and she would be "sitting [and] doing boxes" when the warehouse is not heated or air-conditioned. T. 51.

Plaintiff then sought janitorial work at Wal-Mart, and later at Service Master. T. 51-52.  Between these two posts plaintiff worked as a hairdresser because she thought it would be "okay" to have a license as a backup. T. 51-52.  Claimant opined, however, that because of her rhinitis, she could not continue such work due to the chemicals involved. T. 51-52. She also stated that a cosmetology job would require working in a "chain," which she thought would not "work" for her insurance.[7]  T. 52.

The ALJ then inquired into plaintiff's depression and anxiety.  T. 56.  Plaintiff admitted that she does not receive mental-health treatment, and has not taken medication for such problems for the past six or seven years.  T. 57.  Claimant stated that, in the past, she had taken the medication until she "felt like it did . . . some good."  T. 57.  When asked why claimant's mental impairments prevent her from working, claimant responded that they inhibit her ability to focus, in addition to the

---

[7]The status of plaintiff's insurance is unclear.  When the ALJ asked if plaintiff had "medical coverage," she answered, "I do not have it.  My husband pay[s] out of pocket." T. 52.  The ALJ then asked: "But you have insurance?"  Plaintiff replied, "Yes."  T. 52.  Later in the hearing, however, the ALJ inquired: "You've got medical insurance, why aren't you doing something about [your mental problems]?"  T. 58.  Plaintiff did not deny having medical insurance in her response.  T. 58.

"different levels of anxiety and the pain that I have." T. 57. Plaintiff stated that she had not recently sought mental-health treatment because she "looked at the physicians to address that more than [her] just taking it upon [her]self." T. 58-59. Plaintiff asserted that she may have asked Dr. Buckley about it, but did not think Dr. Zweikoft "looked into whether he [could refer her] to . . . a psychologist." T. 58. She did not feel a referral "had [been] made readily available." T. 58. When the ALJ asked why plaintiff had not been more aggressive about seeking treatment if the problem was so bad, plaintiff responded that she had planned to seek mental help in 2011. T. 58.

Plaintiff then described her activities of daily living. T. 59. She detailed that she can prepare small meals for herself, shower, perform light dish washing and laundry, and handle light dusting if necessary. T. 59. Plaintiff also stated that she can shop "a little." T. 59. She receives help from her husband and son. T. 59. Regarding finances, plaintiff stated that she mails the bills and writes checks, but her husband decides what gets paid and when. T. 60. Plaintiff acknowledged, however, that she and her husband together "do the banking, [take] care of the bills . . . make sure the mortgage is paid." T. 60. She stated that some days she is "not into it" and will "put it off," or forget, prompting her husband to remind her about it. T. 60.

Concerning her social life, plaintiff stated that she attends church once or twice a month, when she is able. T. 60. She visits her mother and sister, and drives occasionally. T. 60. During the day claimant watches television or reads the Bible, and sometimes folds clothes. T. 61. She stated that she spends five or six hours a day laying down, usually in two-hour increments, because it helps with the pain. T. 61.

Upon the conclusion of counsel's questioning, the ALJ received testimony from Eric Anderson, a vocational expert. T. 62. Mr. Anderson asked for a

clarification regarding whether Ms. Wilkins had worked as a sales clerk.  T. 62.
Claimant testified that she did backup cashier work at Wal-Mart, but it was not a
normal part of her job.  T. 64.  She expressed difficulty with running the cash register
because "[s]ome of it contained math."  T. 64.  The vocational expert then described
claimant's past work as a warehouse worker, janitor, cosmetologist, and receptionist.
T. 65-66.

The ALJ posed an initial hypothetical question, inquiring into the availability
of jobs for a person like Ms. Wilkins, taking into account her vocational and medical
factors:

> [A]ssume we have an individual with the same work history as you've
> already described for Ms. Wilkins. [A]ssume further that we have an
> individual who is limited to lifting and carrying no more than 20 pounds
> occasionally and 10 pounds frequently; would need to be able to change
> positions from sitting to standing but would not have to leave the work
> station. No more than occasional operation of the foot controls. No
> climbing ladders, scaffolds or ropes and no work around unprotected
> heights or dangerous equipment and no more than occasionally climbing
> stairs and ramps or bending, stooping, kneeling, crouching and crawling
> and no complex or detailed job instructions. [C]ould such an individual
> perform any of the work that Ms. Wilkins has performed in the past?

T. 66-67.  The vocational expert responded that such an individual could not perform
Ms. Wilkins' past work. T. 67.

The ALJ then followed up with a second hypothetical question:

> [A]re there any jobs in the region or . . . country that such an individual
> with the same work history as Ms. Wilkins, that is, a younger individual
> with a high school education, are able to perform?

T. 67.  The vocational expert answered affirmatively, and cited a representative
sampling of jobs: office helper, garment sorter, and photocopying machine operator,

all light and unskilled. T. 67.

The ALJ then posed a final hypothetical:

[A]ssume the same restrictions as previously identified, but now, on occasional basis, that's up to a third of the time, the individual would be unable to complete a workday or would be unable to get to work on time or maybe not even be able to work at all . . . [o]ccasionally throughout the month the individual would be unable to basically meet routine attendance requirements . . . [w]ould you be able to identify jobs?

T. 68. The vocational expert responded that no jobs would be available. T. 68. The hearing was then closed. T. 68.

<u>ANALYSIS</u>

Claimant raises two issues in this appeal, arguing first that the ALJ erred in rejecting the opinion of her treating physician and rendering an RFC assessment which is not supported by the medical opinion of any treating or examining source. (Doc. 17, p. 1). Plaintiff secondly argues that the ALJ failed to pose a comprehensive hypothetical question to the vocational expert. (Doc. 17, p. 17).

Addressing plaintiff's first issue, "The opinion of a treating physician . . . 'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'" *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (*quoting Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997)). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1241. "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Lewis*, 125 F.3d at 1440.

The ALJ found Dr. Zweikoft's records internally inconsistent and inconsistent with his opinion, thus according his opinion little weight.   T. 30-31.   The discrepancies the ALJ points to in Dr. Zweikoft's records are apparent on their face. The ALJ first stated, "On April 23, 2009, Dr. Zweikoft noted the claimant['s] failed interventions, even though he reported she had some improvement with lumbar decompressor."  T. 30.  It is hard to see how one who seemingly failed interventions categorically can also show improvement with a treatment procedure.[8]  Secondly, the ALJ noted that "[o]n August 27, 2009, Dr. Zweikoft reported the claimant described worsening pain symptoms which failed to improve following treatment; however he stated, 'The patient is essentially stable at this time.  She does have intermittent pain complaints . . . .'"  T. 30.  It is true that "stable" pain does not equal "better or nonexistent" pain, as plaintiff states.  (Doc. 17, p. 10).  But a report that a patient is stable, with only intermittent pain complaints, is inconsistent with a report stating that a patient has worsening pain symptoms (i.e., is not stable), particularly considering the two reports were made during one visit.

Dr. Zweikoft's records are also inconsistent with his own opinion.  In the very visit just described, Dr. Zweikoft listed that trigger injections "will hopefully get [plaintiff's] pain under control and give her better function."  T. 382.  An indication that plaintiff's problems could be managed with conservative treatment is inconsistent with Dr. Zweikoft's opinion just three months earlier that plaintiff's pain is

---

[8] Plaintiff's only argument in response is that she needed another decompressive procedure, but did not get one because of insurance issues.  This statement not only fails to address the inconsistency, but is also disputed by other evidence in the record.  On two occasions plaintiff stated that she did not follow through with the recommended second procedure because she was either too scared, or she felt that the first procedure did not give "sufficient relief . . . to justify further treatment."  T. 53, 311.

"debilitating," and would categorically prevent her from bending, or other activities. T. 324, 389. As the ALJ noted, the same applies for Dr. Zweikoft's February 24, 2010, report that claimant, though presenting with some increased pain, "has done fairly well with conservative care." T. 30, 381.

Additionally, the ALJ concluded that "[a]bnormal findings on clinical examinations by Dr. Zweikoft have generally been limited to palpable trigger points and muscular tenderness and thus do not support the severity of limitations in his opinion." T. 31. Plaintiff responds that the ALJ's statement ignores the MRI results as they were incorporated in Dr. Zweikoft's treatment notes. (Doc. 17, p. 10). This argument is not persuasive. Dr. Zweikoft did record plaintiff's MRI results. The ALJ, however, fairly characterized Dr. Zweikoft's treatment history with plaintiff as one in which the doctor generally provided injections for palpable trigger points in her back and neck.[9] T. 381-404, 435-41. Dr. Zweikoft's post-hearing records provided by plaintiff to the Appeals Council further support the ALJ's decision. In August 2010 Dr. Zweikoft noted that plaintiff "responds quite well to trigger point injections and has been stable on this regimen."[10] T. 438.

Plaintiff asserts that Dr. Zweikoft should have been re-contacted if the ALJ felt

---

[9] The ALJ did separately reference plaintiff's 2006 MRIs in the RFC determination. T. 28.

[10] Plaintiff argues that the ALJ, by rejecting Dr. Zweikoft's opinion, also rejected the opinion of Dr. Timmons, with whom Dr. Zweikoft had agreed regarding plaintiff's limitations. (Doc. 17, p. 8). In doing so, plaintiff twice labels Dr. Timmons as a treating physician. (Doc. 17, p. 6). This conclusory title is questionable considering that the record shows only three visits with Dr. Timmons over a six-month period, almost two years before the alleged onset date of disability. T. 306-09. Additionally, such a rejection cannot be implied from the ALJ's opinion. The ALJ made note of Dr. Timmons' opinion in referencing Dr. Zweikoft's agreement with it, but as it occurred before the alleged onset disability date (and before plaintiff's first disability hearing with an ALJ on April 14, 2009), it was considered for historical purposes only. T. 23, 30.

the doctor's conclusion lacked sufficient explanation.  (Doc. 17, p. 13).  The ALJ does have a duty to develop a full and fair record.  *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).  The ALJ's concern, however, was not with a lack of explanation for the opinion, but was instead with the explanation's inconsistency with the objective medical evidence.  T. 30-31.  Additionally (though not noted by the ALJ), State agency physician Dr. Louis did indeed contact Dr. Zweikoft when completing a physical RFC assessment in November 2009, but determined there were "no additional records to support [Dr. Zweikoft's] opinion."  T. 379.

Although I have concluded that substantial evidence supports the ALJ's decision to accord Dr. Zweikoft's opinion little weight, I nonetheless consider the second part of this issue that plaintiff raises by assuming, *arguendo*, that the decision corrupted the RFC determination.  Plaintiff argues that, in rejecting Dr. Zweikoft's opinion, the ALJ favored no other opinion evidence in calculating the RFC, thus leaving the RFC unsubstantiated.  (Doc. 17, p. 12).  Plaintiff mistakenly asserts that the only other physical RFC assessment of record was completed by Dr. Lucey on December 2, 2008.  (Doc. 17, p. 12).  State agency physician Dr. Louis actually completed plaintiff's last physical RFC assessment on November 30, 2009.  It appears that the ALJ may have overlooked this assessment, as it is not mentioned in the ALJ's opinion.  Such an oversight is not material to the disposition of the case, however, because the ALJ's restrictions are even more limiting than the ones Dr. Louis noted. Dr. Louis listed no postural limitations, and did not prohibit pushing or pulling.  T. 374-79.  The ALJ, taking a position more favorable to claimant, determined that she could only occasionally operate foot controls, bend, stoop, crouch, kneel, crawl, or climb stairs or ramps, and would need to change positions from sitting to standing.

T. 27.

The ALJ does not have to match the RFC determination to a single medical source statement, nor order a consultative examination after discounting a treating physician's opinion. *See Poke v. Astrue*, 1:10CV768-CSC, 2012 WL 174472, at *4 n.10 (M.D. Ala. Jan. 23, 2012) ("[T]he court disagrees to the extent that these cases suggest that the fourth-step [RFC] determination must be based on a medical source evaluation. *Nation v. Barnhard*, 153 F. App'x 597 (11th Cir. 2005), does not hold that an ALJ must secure an [RFC] assessment from a medical source . . . [t]he court [in *Nation*] held that the record contained sufficient other evidence from which the ALJ could reach his conclusion.").  An applicable Ruling is consistent:

> The [RFC] assessment is based upon consideration of all relevant evidence in the case record, including medical and relevant nonmedical evidence, such as . . . an individual's own statement of what he or she is unable to do, and many other factors.  [A]lthough an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment [which is] an issue reserved to the Commissioner.

SSR 96-5P, 1996 WL 374183 (July 2, 1996).

Plaintiff relies upon *Freeman v. Schweiker*, 681 F.2d 727 (11th Cir. 1982), to assert that the ALJ "cannot substitute his or her judgment of a claimant's condition for that of the medical and vocational experts."  (Doc. 17, p. 14).  This is true, but inapplicable here, as the ALJ in *Freeman* erroneously crafted an RFC by relying solely on the claimant's appearance during the hearing (a practice condemned as "sit and squirm" jurisprudence).  *Freeman*, 681 F.2d at 730.  In the present case, the ALJ did not question the physicians' diagnoses, or diagnose plaintiff independently – the ALJ only questioned the effect of the symptoms on plaintiff's work capabilities.

After rejecting Dr. Zweikoft's opinion, the ALJ developed a residual functional capacity based on the record as a whole.  In doing so, the ALJ found that claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the ultimate RFC determination (a finding that plaintiff does not challenge).  T. 28.  As part of that finding, the ALJ noted many instances where plaintiff failed to mention her neck and back pain during treatment for general health issues:

> There is no evidence the claimant sought treatment for approximately three months between May 23, 2009, and August 27, 2009, with the exception of a consult for dysphagia on June 26, 2009.  On September 10, 2009, she reported . . . that she was "very pleased with her response to Mobic for joint pain."  On October 13, 2009, the claimant sought emergency treatment for chest pain.  She denied back pain. On February 14, 2010, she sought care for dysuria, urgency, and frequency at a local urgent care clinic.  She reported for further care of the same symptoms [two] days later.  She noted that her legs "ache at times."  She had "[n]o complaints of mid back pain."

T. 30.  The lack of documented complaints is relevant considering that, when plaintiff did mention back or neck pain, Dr. Buckley made note of it.  T. 334.  The ALJ nevertheless accounted for plaintiff's credible statements by, for example, providing that plaintiff would need a "sit/stand" option, supported by her testimony that she can only sit for thirty minutes before becoming "rigid."  T. 55.

The ALJ concluded that the medical record was not consistent with an "inability to perform any sustained work activity," noting that plaintiff's treatment has been routine and conservative in nature, with the pain generally limited to certain

trigger points.[11]  T. 29.  The ALJ did, however, address the objective evidence documenting plaintiff's physical problems that would prevent her from performing a full range of light work, including MRIs showing cervical and lumbar impairments, and a history of treatment notes discussing palpable trigger points.  Using such evidence, combined with plaintiff's credible statements, the ALJ accordingly reduced the RFC by limiting plaintiff to only occasionally performing actions that would affect her injuries, such as pushing or pulling, bending, and climbing stairs.  T. 27.  Substantial evidence in the record supports the ALJ's RFC determination concerning plaintiff's physical impairments.

Further arguing that the ALJ's RFC determination is unsupported, plaintiff takes issue with the fact that the only mental limitation is a restriction from "complex or detailed job instructions."  (Doc. 17, p. 14).  Plaintiff argues that this limitation is not supported by the psychiatric evidence, implying that it does not fully account for her mental problems.  (Doc. 17, pp. 14-17).

The ALJ gave "significant weight" to the opinion of non-examining physician Dr. Meyers because it was consistent with the medical record as a whole, and no treating physician had determined that claimant required greater mental restrictions.  T. 32.  The ALJ additionally noted that "as a medical consultant with the Administration, [Dr. Meyers] is well versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act."  T. 32.  Dr. Meyers' MRFC assessment was primarily based on the report of examining psychologist Dr. Danahy (the only other physician to evaluate plaintiff's mental health).  The two

---

[11] Though it was stated in a different part of the ALJ's opinion, the ALJ also described plaintiff's ability to perform light household chores, drive, attend church, and shop.  T. 31.

reports are consistent with one another.  Both psychologists assessed depressive disorder and concluded that plaintiff's functional limits were mainly due to her physical pain.  T. 353-54, 365-71.  Though Dr. Danahy assessed plaintiff's GAF score as 55, the Commissioner, as the ALJ noted, has declined to endorse the GAF scale because the scores have no "direct correlation to the severity requirements of the mental disorders listings."  T. 32; *Wind v. Barnhart*, 133 F. App'x 684, 691-92 n.5 (11th Cir. 2005).

The Social Security Regulations address the consideration accorded to a claimant's mental limitations in the RFC determination:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis.  A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(c).  In the MRFC assessment Dr. Meyers translated plaintiff's mental problems into work limitations, ultimately concluding that plaintiff was moderately restricted in her ability to maintain concentration, persistence, or pace. T. 369.  The ALJ thus accounted for this limitation by ruling out jobs with complex or detailed instructions.[12]  To the extent that plaintiff asserted any more serious limitations, the ALJ properly discounted them by noting plaintiff's lack of treatment,

---

[12] The correlation between these mental restrictions is discussed more fully in the analysis of the  second issue plaintiff raises.

as evidenced both in the record, and by plaintiff's own admission at the hearing.[13]  T. 31.  As the ALJ noted, on July 21, 2009, plaintiff herself reported to a state disability examiner that she did not have a mental health problem.  T. 31.  Substantial evidence supports the ALJ's mental limitation in the RFC determination.

As plaintiff's second issue, she argues that the ALJ erred in failing to pose a comprehensive hypothetical question to the vocational expert.  (Doc. 17, p. 1).  The ALJ determined that plaintiff had "moderate" limitations in her ability to maintain concentration, persistence, or pace.  T. 27.  In the hypothetical, the ALJ assumed that the individual could not work with "complex or detailed job instructions."  T. 66.  Ms. Wilkins argues that such a restriction does not equal a "moderate limitation in maintaining concentration, persistence, or pace," and thus the vocational expert did not appropriately consider her full limitations when determining what jobs she could capably perform.  (Doc. 17, p. 20).

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (*citing Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002)).  Here, the ALJ implicitly accounted for plaintiff's moderate limitation in the hypothetical. "[A]n ALJ's hypothetical restricting the claimant to simple and routine tasks adequately accounts for restrictions related to concentration, persistence, and pace

---

[13]  Though Dr. Zweikoft assessed plaintiff with depression and anxiety in April and May, 2009, the ALJ pointed out that Dr. Zweikoft did not prescribe mental health treatment or note psychological symptoms in subsequent assessments.  T. 31.  Additionally, it does not appear that such assessments were based on a complete mental-health evaluation (particularly when considering that Dr. Zweikoft is a pain-management specialist, not a psychologist).  T. 400.

where the medical evidence demonstrates that the claimant retains the ability to perform the tasks despite concentration deficiencies." *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869 (11th Cir. 2011) (*citing Winschel*, 631 F.3d at 1181) ("When medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations.").

State agency psychologist Dr. Meyers specifically found that plaintiff retained the ability to perform simple, repetitive tasks, and likely retained the ability to perform tasks at higher levels, despite any identified limitations. T. 371. Examining psychologist Dr. Danahy characterized plaintiff's mental status as "reasonably intact," noting that her insight, judgment, and ability to form rapport, were all intact. T. 352. Dr. Danahy also reported that plaintiff's mental limitations would not interfere with her past work, citing plaintiff's ability to interpret common proverbs, remember objects, and count backwards from twenty. T. 352. Interestingly, claimant's "past work" included time as a cosmetologist – a "skilled" job requiring a cosmetology-school license. T. 66, 352. If Dr. Danahy found that plaintiff's impairments would not prevent her from performing skilled work such as cosmetology, then they certainly would not prevent her from performing the unskilled work listed by the vocational expert. T. 67. The objective medical evidence demonstrated that plaintiff could engage in unskilled work despite limitations in concentration, persistence, or pace, and the ALJ's restriction from "complex or detailed job instructions" thus accurately reflected plaintiff's capabilities. T. 66. The vocational expert sufficiently accounted for such limitations by restricting plaintiff to unskilled work. T. 67.

Substantial evidence therefore supports the ALJ's finding that plaintiff could perform a significant number of jobs in the national economy.

Where, as here, the ALJ has conducted a thorough examination of the record and properly considered claimant's medical condition as a whole to reach a determination supported by substantial evidence, this court may not reverse the Commissioner's decision. *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

It is therefore respectfully RECOMMENDED:

The applications for disability insurance benefits and supplemental security income be DENIED and the Commissioner's decision be AFFIRMED.

At Pensacola, Florida, this 11th day of July, 2012.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**



<u>NOTICE TO THE PARTIES</u>

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).